Thank you, your honors. I'm Joseph Kreitz, today appearing on behalf of the plaintiffs' appellants, Claude Aragon, Jack Adams, Spindex Physical Therapy USA and the Arizona Chiropractic Society. With me today at the council table is my co-counsel, Joe Garofalo, and also Marcia Boe, appearing on behalf of Secretary of Labor, Thomas Perez. Also in the gallery today is Tom Blankenbaker, the owner of Spindex Physical Therapy. Have you folks decided how you're going to divide up the Yes, your honor. With the leave of the court, I would like to reserve five minutes for my rebuttal, and we've given five minutes of our time to the secretary. Great. When you're down to ten, I'll stop you and turn the floor over to counsel. Thank you, your honor. If you don't have your health, your honor, you have nothing. At issue here today is whether Arisa-regulated health insurance companies have to keep their promises, or whether they can breach those promises and violate Arisa with impunity to the injury of patients and health care providers everywhere. We'll be arguing today that the only way this court can affirm the decision of the district court below is to adopt at a minimum all four of the following propositions which are untenable. The first untenable proposition is that this court should create a circuit split with the Eleventh Circuit and hold that in the absence of a balanced bill, in the absence of pursuit of collection from a health provider's patients, a health provider with an otherwise valid assignment lacks Article III standing to pursue payment from the insurance company as the patient intended in the first place. But you didn't just not balance the bill. You wrote off the debt. Did not, your honor. You didn't write it off? Did not write off the debt, your honor. And that goes to the fourth untenable proposition, which we'll get to later. But this court would have to hold that Rule 56 no longer applies, that a profusion of evidence creating tribal issues of material fact is no longer a bar to summary judgment in the Ninth Circuit. Speaking to the issue your honor was addressing, Spindex's internal accounting records were adjusted to reflect the claims which United had denied. But we put an expert declaration in the record. Wait, wait, wait. Let's stop there. What does it mean you adjusted your accounting records? As the expert declaration in the record, which the district court completely disregarded, said, accounting entries and adjustments were made for tax and accounting purposes. That means you zeroed out the account. Isn't that right? For the books of the business. Well, for whatever reason, I mean, in front of God and everybody, you zeroed out the account. Not in the patient records, your honor. The patient billing records were maintained live and active. Let me read you, it says, it is my expert opinion that these types of accounting entries would zero out patient accounts, are not indicia of debt forgiveness or whatever. You did zero out the patient accounts, didn't you? Accounts were zeroed out where there had been no payment. But as that very same declaration says, your honor, this does not amount to debt forgiveness. At a minimum, that creates a tribal issue of material fact in the question. And there was no counter declaration provided by the defendants to suggest otherwise. Would this be a different case if this had been just an outright and complete assignment? I mean, how is this different from any assignment? And the assinee now, now just brings suit because he's been assigned the right of action. I mean, I don't, in a sense, I don't understand why this is an Article III question, or if this is an Article III question, why it doesn't endanger any assignment? Well, it does, your honor. And I think that question might be better put to the other side. But our position is that when a patient with an ERISA-regulated insurance benefit assigns that benefit to a health care provider, that patient has a right under ERISA to have the insurance company pay the benefits as they have requested. But the failure to do so creates an issue. You're missing my point. And maybe you're right that it should be directed to the other side. I mean, if you, if your client, Spindax, is the assinee, it has a right as an assinee. You're not suing on behalf of the patient anymore. You're suing in your own right because you're the assinee. Absolutely, your honor. End of story. I can tell you what I believe the other side's argument on that question is, but I think that's a correct analysis. The argument on the other side is that there's the, the standing of the assignee is completely derivative of the injury to the assignor. And in the absence of a balanced bill, there is no injury to the assignee. That, that appears to be United's argument. Okay. Well, we can hear it directly from them. Two other untenable propositions this Court would have to accept in order to uphold the decision of the district court. You would have to agree, notwithstanding the DOL's amicus and your own decision in the Barboza case, that health plan compliance with the provisions of the secretary's claims regulation is not mandatory, but only voluntary, and violations of that claims process do not yield deemed exhaustion, notwithstanding the provision of the regulation that says it does. I had trouble understanding your brief on this point. Your brief almost entirely or maybe entirely ignores the fact that the district court reconsidered her order in light of Barboza. I mean, I spent an awful lot of time before I realized that, because your brief seems to think that the deemed exhaustion thing is an important matter. But once, once Judge Silber went back and reconsidered, I don't see that that issue is really on the table anymore. It's on the table because the Court held that there was a lack of factual exhaustion on the part of the named plaintiffs, Claude Aragon and Jack Adams. And our argument all along had been, in the absence, one, there was, in fact, exhaustion. And I can provide you the sites of the record for that. But that aside, there was no need for any of the individual participants in this case to have factually exhausted their benefit claims because, by virtue of United's systematic, pervasive violations of the claims regulation, in all cases, exhaustion is deemed to have occurred, so it is no longer a bar to bringing suit. And that is the Secretary of Labor's position as well. But maybe I misunderstood Judge Silber's order upon reconsideration, and maybe I misunderstood it because she didn't actually specifically name Aragon and Adams, she just referred generally. But as I understood her order upon reconsideration in light of Barboza, she said they've been deemed exhausted. Am I wrong? You know, Your Honor, I apologize. I can't answer that question as I stand here right now. I will answer it in reply. And I know it's not in your brief, but when I went back in there and I saw her order reconsidering her order, previous orders deemed exhausted, I thought, hey, that question is off the table. If that is correct, Your Honor, then there's no need to consider it. If she is – if she agrees with the Secretary of Labor now, then we don't need to argue about it, if you're correct. People may want to fight with Barboza, and she disagreed with Barboza, making it very clear that she thought it was a ridiculous decision, but then she thought she had to correct. There was additional substantial disputed evidence, Your Honors, as to questions that the Court nonetheless found presented no disputed issues of fact. Among those are whether the contractual limitations period that appeared in only two of the regulations and was, therefore, enforceable. To the contrary, you need to look no farther than the plan documents themselves to see that the contractual limitations periods in those two plans do not comply with the regulations. The discount tire plan is one, and it appears in volume three of the record, beginning at page 479. The Martz plan document is the other, and it appears in volume five of the record, at page 1108. The Secretary's regulation requires a contractual limitations period to be placed adjacent to the benefits provision of the summary plan description of the plan. In both of these cases, the contractual limitations period is buried literally 30 pages away from the benefits provisions of the plans. These do not comply. Moreover, as this Court held in Chappell v. Labcorp, as the Southern District of New York held in Novick, which we cited in the briefs, in which both the First and Second Circuits have held in Ortega and Veltri, the failure of a plan administrator to disclose the existence of time limitations that could become a bar to the claim in the final denial letter is a bar on that administrator asserting that. So United waived its right to assert contractual limitations periods as to claims under those two plans by failing to, one, draft the summary plan descriptions in a way that complied with the regulation, and, two, present the existence of the contractual limitation period in its denial letters. Although on that second argument, it seems to me that our case law is very clear that when the administrator denies, it has to give reasons for the denial related to coverage, the particular treatment sought, and so on. I'm not sure that case law extends to such things as a limitations period. Your Honor, you yourself wrote in Chappell v. Labcorp that the failure to disclose the time limits that governed a mandatory arbitration provision in a plan prevented the plan from invoking those limitations. And you further wrote that it's a breach of fiduciary duty to fail. I don't remember that case. What's the date of that case? I'll go back and look at it, okay. I see you're down to the time to turn it over to the Secretary of Labor. Yes, Your Honor. Unless you have more questions now, I'll reserve the rest of my time. You know, I do have one more question, and that is with respect to Adams and Aragon who are claiming in their own right. Is there any realistic possibility that your company will go after them for money? If the claims are not paid by United, by this litigation or otherwise, there remains, as there always has been, a realistic possibility that Spindex will ask its patients to pay the unpaid balance. What's the evidence of that since you wrote off the debt? Well, again, Your Honor, the debt was not written off. Well, I'll use your words, your experts' words, that it was zeroed out. Correct. Okay. What's the evidence other than that it's been zeroed out? One moment, Your Honor. At page 5722 of the record in volume 23, you can see an example of the assignments that every single patient signed and agreed to when they originally signed up for treatment with Spindex. And each one says, quote, I have agreed to pay any balance of said professional service charges over and above the insurance payment. Spindex insisted that his patients sign that statement. Yeah, you're telling us what we already know. These have been assigned. What I'm asking you in answer to Judge Fletcher's question is what evidence is there that you're really going to pursue it since you've zeroed it out? The evidence is, Your Honor, that at the time the patients were signed up and with every billing receipt sent to every patient, Spindex insisted that they acknowledge that they remained liable for any balances that their insurance company did not pay. You can also look at the Spindex ever gone after one of its clients? Not to date, Your Honor. And let me ask the question of a slight variation. Assume for the moment, although it's a question in front of us to be decided, assume for the moment that Spindex is a proper assignee of these patients who are treated by Spindex and that there's no Article III problem. So assume that you win on that argument for purposes of the question I'm about to ask. If that is so, is there any realistic possibility that you will go after Mr. Aragon or Mr. Adams? Only if the litigation concludes without United making any payment of their claims to Spindex. Is there a statute of limitations on the time you can go after your client? Probably. It would be running now with respect to, I believe, Mr. Adams, and it would run soon with respect to Mr. Aragon. And what is the period? Six years under Arizona law. Six years? And is the six years run? As to Mr. Adams, yes. As to Mr. Aragon, not yet. Other than your assertion, is there any evidence that you intend to pursue it? Yes, there are three pieces of evidence, Your Honor, as I was saying. The first is the language in the assignment where the patients acknowledge that they continue to remain liable for unpaid balances. There's language on the billing receipts, which are in the record at volume 13 from page 2903 to 3045, and volume 14 from page 3047 to 3242, where the patients likewise specifically acknowledge on Spindex's request that they remain responsible for the unpaid imbalances. And after the district court first addressed the issue, Spindex sent out correspondence to all its unpaid patients with unpaid accounts, saying, we are hereby notifying you as required by the district court that, as with all the other documents you've always signed, we continue to hold you responsible for the balance that the United doesn't pay. Thank you. Okay. Thank you. Thank you. Thank you, sir. Good morning. I happen to have the Chappell case, Your Honor. I'm sorry. I happen to have the Chappell case, if the court didn't get that full cite. That's okay. And does it say W. Fletcher, or does it say B. Fletcher? I believe it is, Your Honor, I believe it is W. That's me? Okay. That's okay. No, I can find it. I can find it, I'm sure. Good morning, Your Honors. The Secretary is here. Could you give us your name for the record, please? Yes. I am Marcia Bove. I represent the Secretary of Labor. Thank you. The Secretary is here to address two issues. First, ASCENI physicians with validly assigned benefit claims have standing to pursue those claims regardless of whether or not they first billed their patients. The district court erred by adopting United's argument that injury, in fact, is limited to an out-of-pocket loss. Second, the Secretary wants to address the dismissal of the fiduciary breach claims because the court viewed them as inextricably intertwined with the benefit claims. As to standing, settled Ninth Circuit and Supreme Court precedent has defined injury, in fact, sufficient to invoke federal court jurisdiction in terms of three elements. The invasion of a legal right that is concrete and particularized and causes an actual or imminent injury that can be redressed by the court and is not speculative. The settled precedent in a wide variety of factual context demonstrates that injury, in fact, is not limited to an out-of-pocket loss. The Eleventh Circuit rejected the view that providers must collect from their patients before they may proceed on contractual – on validly assigned contractual rights against a plan insurer who, after all, has the contractual obligation to pay for covered care. In accordance with the plan's terms and the minimum requirements of the Secretary's claims regulation, the Eleventh Circuit reached that result in HCA because permitting participants to assign their benefit claims allows injured plan participants to receive covered care without risking delay or denial when a participant cannot personally pay for covered care. Or finance costly medical care. Thousands of health care claims are made in this country every day, and some are litigated, and yet no circuit court has ruled that providers must first bill their patients before they may enforce legitimately assigned benefit claims. The paucity of precedent for that ruling is telling. Should this court affirm the district court's standing ruling, it will be the first and only circuit court in the United States to have done so, and it will create an immediate split between the Eleventh and the Ninth Circuits. But much more importantly, the practical implications of such a ruling would be dangerous. Limiting physicians' first reforce to their patients will have a chilling effect both on the providers and on plan participants. Participants may forego or delay vital health care because they cannot finance or cannot pay for that care. And providers may limit their care to those participants whose plans have previously paid validly assigned claims, or to participants who are able to first pay for the care, or that the provider can recognize as creditworthy. Affirmance of the district court's ruling can only benefit conflicted administrators, such as United, that both fund and administer ERISA plans by allowing them to forestall payments for substantially expensive medical care, or maybe avert that payment altogether, avoid that payment altogether. I'd like briefly to turn to the district court's ruling dismissing the fiduciary breach claims because they were inextricably intertwined with the benefit claims. Now, before you get to that question, it may be not a question on which you're prepared to speak. It strikes me that the assignment to Spindex did not include an assignment of the fiduciary duty claims. Do you agree with that? Well, the Secretary has no position on that question, Your Honor. Okay. And I'm not authorized to provide one. Okay. Okay. The short answer to the district court's dismissal of the fiduciary breach claims is that controlling precedent of this Court precludes that ruling. But the Supreme Court in Massachusetts Mutual has recognized that systematic procedural violations can support a fiduciary breach claim. And the district court itself found that United, the police regularly ignored or violated the procedural requirements of the Secretary's regulation. The logical implication of that ruling would have been at a minimum to deny summary judgment to the appellees. Instead, the district court granted summary judgment and did so without citation to fact and without citation to precedent on essentially a rhetorical premise that they were inextricably linked. That creates an incentive to disregard the claims reg. If the district court had the appellees abided by the terms of the claims regulation in their processing of these claims and the planned terms, perhaps the district court would not have had to deal with this difficult case in the first place. Thank you, Ms. Bell. Good morning. Good morning, Your Honor. May it please the Court. My name is Nicholas Pappas of Weill, Gottschall & Mangese. We represent the United Defendants and Certainty of the Planned Appellees. I wonder if you could pull the mic down a little closer to your mouth. Thank you. I'd like to first respond to the Department of Labor's and the plaintiff's argument that injury, that the injury plaintiffs assert to establish Article III standing is violation of a statutory right of the participants to have their provider paid by the plan. This argument contravenes the very nature of out-of-network benefits, arrangements which all parties agree are defined by the terms of the participants' plans. In an out-of-network benefit arrangement, the injury that an arrest of claim for benefits addresses is the injury from the participant's payment for health services, where the plan is required to reimburse the participant under the terms of the plan, but not, but does not. By definition, out-of-network benefits are triggered where the participant visits a provider of his choice, the provider has no relationship with the plan, or its claims administrator. Let me interrupt, if I may. I'm trying to get at the guts of the argument. Are you saying that ERISA forbids an assignment to the health care provider? Not at all, Your Honor. This Court held in Missick that an assignment certainly is permitted. Okay. So if that's so, how is this assignment different from pretty much any other assignment in which the assignee then simply brings suit without regard to any Article III challenge? Your Honor, first, what Missick held was that when a claim is assigned, the assignee stands in the shoes of the assignee. That's ordinary assignment law. Correct. And the claim can be no broader than that assignment. Right. So far, so good. So far, I don't see why the assignee has Article III standing problems. Well, the assignee would have Article III standing if the assineur had Article III standing. Well, the assineur did have Article III standing before the assignment. That's not correct, Your Honor, and that's exactly the basis of the argument. You mean the assineur, absent the assignment, had no right to reimbursement? The assineur had no right to reimbursement where the assineur has never been asked to make payment. Why is that? Well, Your Honor, what the facts are here is very important, and I think the record is very clear, and Judge Silver made it clear that, again, in this out-of-network situation, what happens is the plan has no relationship, and the plan's only obligation is to reimburse the participant for covered services. What if Spindex had said to a patient walking in, our services are $200, and here's what we intend to do. We're going to give you $200 right now. You can return $20 to us as your copayment, and the other $180 you can keep. We'll provide you with services, but you're going to give us an assignment of benefits. So we're actually loaning you $200 here to come and get our services. Spindex is loaning $200? We're going to front the medical care to you, but you're going to give us an assignment of benefits. So Spindex is now actually out money, and a client has actually sort of borrowed money from Spindex in order to obtain full services. And then Spindex assumes the risk that United doesn't pay. In that circumstance, why don't they have standing? Well, Your Honor, that's very different than what happened here. It's not very much. It's just a step transaction. Well, if the Court looks at what actually happened here, the intake forms are very different than fronting the money. The intake forms makes clear that. I just want to be clear. So you concede that in that situation, there would be Article III standing? I think you need to know more facts, Your Honor. I think what's critical is looking at the matter from the perspective of the participant. The participant has to have some request for payment, and the request for payment or some threatened payment injury, that's what's missing here. Why is that so? That's not true for an ordinary assignment. I mean, the ordinary assignment is I am owed such and such by that person over there. I assign it to you. You now stand in my shoes. You bring suit as if you were me. End of story. There has to be a request for payment, Your Honor. Why? If there's no request for payment, what we have here is the participants received the service. They signed some forms which said that we will not ask you for payment until after we bill your healthcare company and even then after we pursue certain appeals and even then after we pursue litigation. We will not come back to you. And that is exactly what happened here. You know what? This just strikes me as a request for meaningless paperwork in a system that already has too much meaningless paperwork. That is, I say it in a slightly more condensed form, but that I think is what Judge Choflot said in the Eleventh Circuit case. Your Honor, that, in the HCA case, Judge Choflot simply was looking at ERISA and saying that, you know, as a matter of policy, that providers are more equipped to pursue the payment from the managed care company. With all respect, we think that's not a constitutional analysis and disregards this circuit's authority. In the Bryant v. American Seafoods case, this circuit came to a very different conclusion, albeit in an unpublished decision. In this circuit, the Ninth Circuit has said that absent any request for payment, absent a bill in that case, which is, of course, a request for payment, an unconditional request for payment, the participant may perceive no likely injury. The injury in this case, because it's an out-of-network benefit, is either payment, if I pay money that I shouldn't have paid, I'm injured, or some likelihood of payment. That's the benefit. And I think that the canard, if you will. But Spindex have gone to their patients and said, either give us, either pay us the money or give us an assignment of your benefits from United. Could you do that? I think that's very much closer to the facts here, Your Honor. If they had done that, I still think the giving the money, of course, would mean the participant is out-of-pocket. Therefore, there's certainly standing the participant is injured. If I paid something I shouldn't have paid, I've been injured. If a mere assignment really depends on what it is that's been assigned, I think the predicate of Your Honor's question, Judge Fletcher, is that you're assuming that the benefit here is a payment to the provider. That's not what out-of-network benefits is. That's more of an in-network situation. In the in-network situation, of course, the provider has a contract with the managed care company, agrees to a fee schedule, agrees not to balance bill, agrees to provide the service in that arrangement. And, of course, all the participants here have both in- and out-of-network benefits. Out-of-network benefits is a special arrangement where the participant gets to choose their provider, make their own deal effectively with the provider, and they have the obligation to pay the provider out of their own assets. There's no plan obligation to pay that provider. The plan obligation, Your Honor, is only upon submission of a claim to the plan to the managed care company, and the benefit is reimbursement. Now, as a matter of grace and as a matter of discretion, the plans certainly accept assignments. Some plans, some plans do not. And we certainly have examples of that in this case. But if the managed care company or the plan accepts the assignment, the payment certainly is made and the absentee can stand in the shoes. But that doesn't change the facts absent an assignment. Absent an assignment, if the participant has not paid or been threatened with some kind of injury, then there's no, there's no. Go ahead. Let me ask you this. Suppose, let me change the facts a little bit. Suppose a patient goes to Spindex, gets services, and Spindex sent a bill to the patient and say please pay within 30 days. 30 days comes and goes. There's no payment. Could Spindex as the absentee then bring the case against the insurance company? If a bill had been sent, that would create the, at a minimum would be the starting point for analysis. At a starting point, the participant may perceive some threatened injury. I'm required to pay something. That's what Article III requires. Okay. Then suppose instead of a bill, they sent out a letter, sort of like the one that was sent out here after the case was started. But suppose they sent it before the case was started. This is just a reminder you're responsible for the bill. Would that be enough? Well, if the reminder said you're responsible for the bill 10 years from now, or in this case it's between 9 and 13 years, I think, Your Honor, so 13 years, clearly this is the poster child of a situation where the provider had no process by which any request for payment was made. And that has to be looked at from the perspective of the date of filing of the complaint. There was never a request to any of these patients to pay any money to Spindex. What is the answer to counsel's answer to my question that they have an accountant who says that zeroing out these accounts doesn't prove anything? Your Honor, it certainly, from our perspective, confirms the facts. It's an after-the-fact confirmation that these intake forms created an obligation that was contingent. A contingent obligation is precisely the type of obligation that Lujan said is a someday intention. Merely having a someday intention that maybe I might come and ask you for payment is not enough. That's what happened here. It's maybe I might ask you, but there was never a request. So these zeroing out transactions that Your Honor showed shows that, in fact, that's exactly what happened here. There was never any expectation for sending a bill. And we would also point the Court to Dr. Blankenbaker's confirmation in a declaration that he had not requested payment from any of the participants before commencing this litigation in March 2008, that at the commencement of the litigation he intended only to request payment after the litigation, and then only if financial or other considerations made that infeasible or impractical. And that's at the record at 2581. This is just like what the Supreme Court said in Lujan is the someday intention that was insufficient to establish threatened injury. And under Lujan and ACLU v. Lomax and Bryan, spindex communications after the filing are irrelevant and can be disregarded. Let me ask it this way.  You say, I think correctly, that what the patient has a right to under ERISA is reimbursement. Yes. Okay. Now, I thought your argument was unless they have paid, they can't be reimbursed. And how can they assign a right to be reimbursed in the absence of already having been paid? But then you say it would be enough if spindex had merely sent them a bill. Those two positions cannot be consistent. Your Honor, I say, as Judge Silver did, that that's a starting point for analysis. I think at the moment of receipt of a bill, I think the Supreme Court precedent would suggest at that point there is some expectation that I may be required to pay. And therefore, that may be enough. Now, if three, four years went by, or if forgiveness occurred, or if something else happened, even that may not be enough, so we're not dealing with that situation. But if the only thing that is necessary is a recognition on the part of the patient of an obligation to pay and a statement by the health care provider that we will insist that you pay in the absence of our getting money from the plan, I mean, that I think is evident from the assignment itself. Your Honor, the request for payment has to be unconditional. And what occurred here was why do you say that? Well, Your Honor, that's first of all, the Bryant case says that. This Court in the unpublished case says that. And there are other cases which say that. But Bryant is not an ERISA case. It comes out of quite a different context. It was a health care case, Your Honor. It was maybe a contractual case. But the context is exactly the same. It was a case where seamen were requesting certain payments, having never paid anything out of pocket and having never billed. And this Court held that, in that case, Lujan controlled. And that's exactly our case. So the logic of Bryant v. American Seafood is flatly contrary to HCA. And we would suggest, Your Honor, that it was correctly decided. Now, Judge Silver, you know, actually didn't address where the line is, I think, Your Honor, saying if a bill is sent. Well, if a bill is sent, maybe that's a starting point. Judge Silver finds as a matter of undisputed fact that in this case, Spindex – there was no evidence that Spindex planned to seek recovery, that it was certainly impending intent to collect, or that Spindex had concrete plans to assert claims. So Judge Silver didn't have to decide if HCA was correct or not, if a bill would be enough or not, because that never happened here. And not only did that never happen, there was no possibility that it would happen. It was exactly the someday intent that Lujan described and that Bryant actually quoted that language from Lujan in, as we say, very similar circumstances. And as Judge Silver concluded, any likelihood that Spindex would seek to collect was speculative and, therefore, there could be no standing. And as we said, Your Honor, these – I see very little evidence that Spindex is going to go after the patient. I mean, what the – it clearly looks like a deal in which the understanding in between Spindex, the provider, and the patient is, if you sent the assignment, we're going to leave you alone. Now, they've got some language in there about you're ultimately responsible, but there's zero evidence that they've ever gone after anybody once the assignment is taking place. And, Your Honor, exactly. And it looks to me like just an ordinary assignment. It is an ordinary assignment, Your Honor. And what was assigned, I think, is the issue. And I think in order to find that something is – But what they've – what the patient has assigned, or at least what the patient purports to have assigned, that's how we read the document, is the right to receive payment. And how – if you're right here, how does that not threaten the Article III standing of pretty much any assignee? It doesn't. You say the right to receive payment, Your Honor, but it's the right to reimbursement. That's the issue. There can be no reimbursement where there's no payment. But you've already walked away from reimbursement because you're saying that if they send them a bill, that's okay. But merely sending them a bill doesn't mean any reimbursement is at issue. Your Honor, it's the distinction between injury and threatened injury. And we would all agree, I think, the payment is the injury. So if the participant pays, that's injury. We all agree on that. Everyone agrees there was no payment here. So that's really not at issue here, the issue of payment. What is at issue here is whether there's a threatened payment that is something that is unconditional, that is immediate, as certainly impending. Well, it seems to me that there's a very clearly threatened issue of required payment if they don't execute the assignment. I mean, everybody understands that. If you don't execute the assignment, you're going to have to pay it yourself. But that execution of the assignment, which gave an unlimited extension of time and obligation to pay, the patients received the service and never had to pay for it. There was a clear obligation to pay absent the assignment. If these patients came in and said, I'm not going to assign this to you, they're going to say, okay, well, where's your check? And that may be, Your Honor, but having signed that assignment and deferred payment indefinitely, that, in fact, is contrary to public policy. So I disagree with the Department of Labor. If there's no patient responsibility for making a payment, that undermines the critical component of the health care system. No, the ordinary way an assignment works is the assignment is itself the payment by the patient. I mean, if I assign my rights to you that is something of value, I have just paid you. And now you take the assignment and you sue as an assignee for what it's worth. Well, Your Honor, that's not the way the health plans work. And I think by saying that, Your Honor, has rewritten the health care plans. And ERISA provides that the health care plans are enforced as written. What Your Honor has described is a different plan that doesn't exist in this case. And so, you know, that's not true. Well, let me say one payment. The patient has given something of value when it gives the assignment. Are you saying that that's not true? It certainly is something of value. In the normal course, Your Honor, if there's a payment to be made that united unless there's an anti-assignment clause, we'll make that payment as a matter of convenience. That is a valuable right. It is a right that the plans honor. What we have here is a situation where the patient's received a non-covered service which United deemed to be experimental and unproven. There was a flat denial of coverage. And Spindex, knowing that, accepted and aggregated tens of that, 10,000 claims in the hopes of creating this litigation. And then subsequently telling the patients, don't worry about it. We may come to you later. We may not. But, you know, we're going to take it from there. I get that part. But what I don't understand is why you don't fight this claim on the merits and say, you know what, this is just a crackpot quack treatment and we're not paying for it. I mean, I think you might have a good defense. I don't know, but that's what you're saying. So why don't you just litigate this on the merits? Well, Your Honor, that is certainly something that could have been done. And, frankly, the question is whether that obligation should be imposed on a managed care company under these circumstances, under these circumstances where the participants were not injured. They got the service and never had to pay for it. Whether there's any reimbursement, which is the threatened injury that occurred. There is no threatened injury because there's no likely to pay. And I see Your Honor, I have a minute to go. If you win, I mean, the moral of the story is they just have to send out bills. Is that the bottom line? Your Honor, that would be the simple answer. But I would even argue that there could be circumstances where that's not enough. But I agree with you that certainly sending out a bill would have alleviated any argument that there was a threatened injury in this case. Your Honor, I wanted to answer Judge Fletcher's earlier question, whether there's a realistic possibility that these companies would go after the participants. The proof is in the pudding. There was no realistic possibility because it never happened in 9 to 13 years after the fact. Any realistic possibility they would go after them, give them the assignment? Well, the assignments, of course, occurred, right? Exactly. Now, your time is going to run. I do want to ask you the question. It applies only to two of the three of the many claimants. The argument is made that the statute of limitation or the contractual statute of limitation appears too late in the plan to be valid. What's your argument? What's your response? Your Honor, first, the contractual limitations applies to the acoustic technologies plan and the March 8th MARGS agency plan. Yes, exactly. Yes. And those plans have a table of contents which would clearly make sense. And so what does the table of contents say? Excuse me? What does it – what is said in the table of contents? Well, I don't have that in front of you. Well, I know it says limitation of action. It says any layperson reading that does not understand that you must bring suit within two years. But that's not the only time it's said, Your Honor. I know. It's then said on the second to the last page of each of the two plans. And do you know what's said there? Your Honor, I didn't bring that with me. But what's more important, Your Honor, is that the explanations of benefits sent to the participant after their service said all of these things, including that there is a two-year period for – in which they could assert claims. But it also says the participant has a right to sue under ERISA, that it would refer them to more information available, and that – and it also provided customer service phone numbers. So all of those things really eliminate the argument that there was any violation of the claim procedure regulations. And certainly the summary plan description sufficiently described the – the suit limitations clauses. I see you're out of time, Mr. Pappas, please. Thank you, Your Honor. Thank you. Mr. Price? Did I pronounce that right? Right. Right. Okay. Hang on a second. Would you – would you put five minutes on the clock, please? There you go. Thank you, Your Honor. It is not correct to say that Spindex never sent a balance bill to any of its patients who are at issue in this case. Volume 16, page 3769 of the record shows a bill sent to one of Spindex's clients for the unpaid insurance balance in the amount of $7,000, asking him to pay the amount that United had refused to pay. The prior page, page 3768, is that client's check for a portion of that amount and a letter saying, I hope my insurance company will pay what's left. So there was a balance bill in the – Is that the only example? Are there other examples, or is that the only example? This is the only example I can find of an actual physical balance bill. There were at least two other patients that the record reflects were balance billed, but I wasn't able to find sites to the actual documents during the time I was at the table. Counsel argued that there was no forgiveness, and the bench characterized the zeroing out of the accounting records as done before the world and everyone. But it's worth emphasizing that those accounting entries were never disclosed to anybody, least of all the patients. Well, it's in your expert's declaration that you filed in court. He doesn't – well, yes. After the fact. But what he doesn't say was that there was any contemporaneous indication to the patients that their accounts had been filled. I guess I'm trying to put all the facts together. You get patients who have never been billed. You get no history of anybody ever been really done for these bills. Then you get your expert saying they've zeroed out the balances. I'm having a hard time finding evidence to support the idea that these are really live claims. The patients have suffered. Your Honor, volumes 13, 14, 15, and 16 of the record include voluminous medical records, contemporaneous treatment notes. Spindex is not merely an aggregator of claims. Nobody disputes that they went to Spindex for services. What I'm saying is from a business point of view, there's really no evidence that you're really going to pursue these debts. Well, there's at least the one that I just showed you. Okay, that's one out of thousands. And you said maybe there's another example in there somewhere. And again, it's not thousands, Your Honor. We're talking about about 60 patients. United's internal database management multiplies those claims out and they make them look like thousands and thousands, but we're talking about 60 patients, each of whom had between five and ten days of treatment. It's not a huge and unmanageable set of assignments. It's one assignment per patient. And Spindex made the decision to go after the party that's actually responsible to pay the benefits, the insurance company. And with at least one patient, for reasons I don't know as I stand here right now, and it's not really before this Court, at a minimum it creates a disputed issue of material fact, but at least with one patient, with the site I just gave you, Spindex did go after the patient and the patient paid a portion of the balance bill. So Spindex's assignment to pursue the claims of that patient lives under all circumstances, as does the right of Claude Aragon and Jack Adams to pursue their breach of fiduciary duty claims against the fiduciary of their health plans, separate and apart from Spindex's standing to do so. Now, if Adams and Aragon, who are the two patients who are not suing merely for whose claims are directly at issue rather than through an assignment, if there's no realistic possibility that they will be done by Spindex, I don't see how they can bring a fiduciary duty claim. The breach of fiduciary duty claim extends much more broadly than simply the confines of the denial of benefits. Right. But I'm trying to figure out, if there's no realistic possibility that they will be obliged to pay anything to Spindex, here I am sympathetic to an Article III standing argument. I don't see what their harm is, which then would be, which is a premise for bringing suit for anything. They have, even if their claims, even if their individual benefit claims were validly denied, Your Honor, the two individual participants have standing under ERISA, Section 502A3, 502A2, both, to sue United as a fiduciary of their plans to correct its fiduciary misconduct. But isn't the premise for such a lawsuit that they have suffered harm? The premise for that lawsuit is they suffer harm when the fiduciary breaches its fiduciary duties, separate and apart from the claim for benefits. So tell me what the harm is. Sure, Your Honor. The harm to them. The harm to them is they know they have an insurance company that will not obey the claims regulation in the administration of future claims. Have they ever themselves submitted a claim to the plans? I don't know what they would submit. I have no idea other than what they've done through Spindex. In those cases, they have Spindex. So in short, there's nothing in the record that shows that they themselves have ever submitted a claim? I believe that's accurate, Your Honor. And there's nothing in the record, as far as I can tell, that shows that there's a realistic possibility that they will ever be compelled to pay anything to Spindex. So I'm having trouble seeing the harm. Well, again, the Court seems to be focused on the statute of limitations question. No, I'm not talking about the statute of limitations question. I'm talking about harm. No, I'm saying, Your Honor, you seem to be focused on the notion that the statute of limitations on Spindex's claim against the patients is run so it can never collect. No, I'm not focusing on that. I'm focusing on Spindex's behavior. Now, Spindex seems not to go against these people for claims. You found one which they've done out of a lot. But I see nothing in the record that suggests to me that they're going to go after either Aragon or Adams. All of the evidence I cited earlier would suggest that, Your Honor. And they will ask them to pay these balances if, in fact, this lawsuit fails to produce payment of the benefits that are being sought under the A1B claim. I see I'm out of time, Your Honor. Thank you. Thank you. Well, thank you. And, gentlemen, thank you as well. The case is argued and submitted. The stand is recessed. Thank you.
judges: Silverman, Fletcher, Bybee